We've read your filings for a re-hearing petition. We are more than familiar with the Milano case because, of course, it came out of our circuit. We had a lot of discussions whether to take the Milano case en banc. I voted one way. Judge Higginson voted the other, as you know from the pleadings. So you have a pretty balanced panel here. Please give us your best argument. We've read everything. Let us know why or if we should change the opinion that was rendered in this case before remand. Yes, sir. Mr. Jeffrey. Yes, ma'am. I'm Jim Jeffrey, and I represent the Sachse police officer defendants. I welcome this opportunity. The case has, as you point out, been remanded to be reconsidered in light of the Mullinex case, and the Mullinex case has some provisions that this court must follow. The Mullinex case sets forth the requirement that the court must look to the particularized facts of the case when evaluating qualified immunity and not look to broad principles. And the briefing that has been submitted, the extensive briefing, doesn't point to a similar to this case in which a court said officers violated the Fourth Amendment by using their firearms to stop a threat. What about the Graves versus Zachary decision that, to me, was the crux of our ruling here more than Luna? In the Graves case, for one thing, it's not clearly established law because it's an unpublished disposition, but for second, the man in that case was kneeling, holding the gun against his own head. He was facing the officers, and at no time was there an accusation that he engaged in any conduct that was threatening or moving. He was ... But Judge Smith's phrase was not just movement. It was there had to be aggressive motion. Well ... To me, that's ... Right, we have a suicidal person here, mentally disabled, so that's similar. Yes. And as far as analyzing the similarities, I'd urge you to look at what Mullinex did, and if I'm mispronouncing it, forgive me. Call it Luna. We don't care. Call it Luna. The Supreme Court looked at this court's reliance on the Little case, and the Little case had parallels to the Mullinex case. It was a police pursuit, dangerous conduct, and the court in the Fifth Circuit in Little basically said that the officers shouldn't have fired because there was a fact dispute, and because of the fact dispute, they had to accept the version of events where at the time of the firing, the fleeing car was driving away. And the Supreme Court basically said that court, that Little case, gave no guidance to Mullinex, or the determination of Mullinex, because it was undisputed that the officers were chasing a vehicle that was driving towards officers who were trying to escape. Luna does say you've got to particularize it to the facts. Correct. But would you agree with me that it was clearly established in 2010 that police could not shoot a citizen because he is armed? That fact in isolation, yes. Okay. So then what we have more here, if this individual, if the gun had been holstered, they couldn't have shot him. No, I think it would depend on what he was doing when it was holstered. Is the only limiting principle that you're offering, this isn't critical of you, but to avoid it to be true that police would always get qualified immunity when they shoot someone who's armed with a weapon, is the only limiting principle here that he turned? No. Okay. And let me explain. This case should be decided based on what happened, according to the plaintiff's expert, somewhere between 5.37 seconds and 7.37 seconds. But evaluating what happened in those several seconds, you have to be informed by what the plaintiff did at the time. And what they knew was they were dealing with a dangerous threat. This young man, and this is all undisputed, and these facts were discussed in the panels previously. Let's say they knew everything about him, Eric, that he avoided the police before, he comes out of the forest, but instead of turning at all, he decides to stop and go back in the forest. They couldn't have shot him then. Standing alone, probably not. So it has to be the turn. And let me talk about that turn. But what we characterized factually in the opinion as a turn where he was unaware there were police. Yes. So he couldn't have presented an immediate danger to them if he didn't even know, or is that wrong? But that's incorrect. Okay. To analyze it from that standpoint, if you look at White v. Pauly that was released after Mullinex, they said you have to look at what the officers, the facts knowable to the officers. And this court recognized that the officers didn't know that his intent was allegedly to go across the street and meet his grandparents. You have to look at the facts that were knowable to and known to the officers. And that's been the rule since Saussure, since Grandi-Connor, and reemphasized in White v. Pauly. So they knew he was disturbed, same as Graves v. Zachary, and they see him come out. They know he doesn't know they're there. Yes. And then they shoot him when he turns. But he isn't turning to get them because they know he hasn't seen them. They all agreed with that. They don't know what he's going to do. And this is why it's very important to focus on what Mr. Bevel, the plaintiff's expert, says, Mr. Bratton, the other experts. Last question, just to interrupt, is what's the limiting principle? If a police officer says, an armed citizen, he made a motion, like even they give him a warning saying drop the gun, but his hand moves to drop it. At that point, will they always have qualified immunity if they shoot him? Under your theory? In isolation, I hesitate to say always. You have to look at the facts they knew. And what I'd like to explain is those several seconds, what's critical. These are fast-moving, undisputedly fast-moving events. The gun was supposedly held somewhere within 30 inches below his head, somewhere 30 inches or closer. It wasn't held against his head. He's turning. And the experts on both sides say action is always faster than reaction. And it's talked about in the- Aren't you saying he was holding the gun? It's not exactly known. The experts- Well, we do know that he shot himself in the temple. Yes. Okay. So he's not holding it down where you're saying he shot himself to the top of his head. That didn't happen. Well, we don't know that. One of the difficulties with your case is that, and also the version keeps nuanced and shifting and so forth, but what you can't escape from is the boy had a gun to his temple and he shot himself in the temple. The stripling shows that that fire mark was close to that temple. Now your problem is he's got the gun to his temple and that's when they fired. Now your argument is that with these experts that go around and say, well, if you don't fire first, it's your life or the citizen's life. Those are the experts that are testifying in these cases. Now my question, though, is they knew enough about this boy that they didn't, as I understand it, they started firing when they saw him. That's never been established. What's not been established? It was established he shot himself. He was shot in the temple. How did that happen with a gun? He's moving with a gun down. He's holding the gun in an upward position. We can see that. But an upward position doesn't quite get there, does it? I'm sorry? I mean, I'm holding the gun in an upward position if I'm down here. His expert testified that the gun was somewhere within 30 inches of his head. And where was the first shot? Where did the first shot hit? In the back shoulder? No, the first shot struck him, according to the expert, as he was turning at about a 90 degree angle. Where? On his body? It went in here. In the shoulder, right. In the shoulder. And yes, and the second shot, he was more or less face on and it grazed the outer part of his left arm. They shot him before he turned completely around. I mean, he's turning this way and they started firing. But the court, this court, has never required an officer to wait until somebody has fully turned. And I point to the cell fire. But that really means this. It's lawful in Texas to carry a lawful carry. And more recently, they tried to make it lawful without a license. So that, and it's also lawful to have a gun in your car and you can walk from your car to your house. It's perfect. So there's all these lawful uses of weapons and guns. Now, what this translates to and the concern is that the officers have a license then to shoot. This is, they know that this is not a criminal, you know, there's no armed robbery that's being escaped. It is a disturbed young man. They know that. But they don't know whether he's disturbed and he's going to shoot them, okay. But what happens is they fire immediately when he's not moving the gun in any direction threatening to them. They're trying to get ahead of anything. But that's what the experts say because reaction time is slower than action. And if he's turning with a gun here, he can do that and shoot them. Where are the guns of the police officers? Police officers had their guns drawn. Yes. Yes. They were already, quote, had the drop on them in the old western scenes. And the experts' testimonies in these cases that I've seen, what they tell them is that you have got to be the one that fires first. And of course, the old westerns, the smart ones fired on, if you want to count to three, they fired on two. And that's kind of what we're arguing here, is the police want to fire on two. But that's correct because in this court's Ontiveros case, Ontiveros and City of Rosenberg, the ranger testified in that case about the training that the officers get. And it's consistent with the testimony of the experts in this case. And the training they get, and it's talked about in detail and quoted in detail, Ranger Cook's testimony, his training officer would hold a simulation gun. You've got your hand down to your side, but that's not where the police officers were. The police officers were standing in a ready-to-fire position. Whoa, whoa, whoa, listen to me. Let's stay with the facts of the case. And that's true or not true? That is true, but I'm trying to ... Okay, now your expert, I'm standing here with a gun. Did your expert testify that he's standing there with a gun, and the guy has got to make a movement and turn around, and he can shoot first? And that's ... Before he can squeeze his trigger. Yes. The testimony ... Go ahead, ask him. I'd like to reference the consistent testimony from Ranger Cook in Ontiveros with Capt. Rodriguez in our case and Officer Tuck, Detective Tuck investigated it. The training the officers get is that the training officer with the simulated weapon has it down here at his side, and the officer who's being trained is pointing his gun. And before the gun can be raised ... I'm sorry, when the man starts raising the gun, the officer shoots, and Ranger Cook said in that training the best he ever did was a tie, and he says, you tie, you die. And that's what we have here. Mr. Bevel talked about human reaction time. That goes back to the original question that puts it under your ... What you just described under your expert's testimony, who are training police officers, and they go around and they earn their money training officers and protect officers. I respect that, and they ought to get the training. But the difficulty that I'm having with that is that by that very testimony, if I'm lawfully carrying a weapon with no other evidence that I have any ill intent toward me or anything else, no crime, whatever, they can shoot me because, why? Because, no, because I can fire for what they can't. That's not what I'm saying, and if I've said that, I'm hoping I'm not misleading. Tell me what's wrong with that. What's wrong with that is there's no underlying information that shows that you're a threat to that officer. Now, I would add, at the time, this young man ... Where is the evidence of that here? Well, the young man has had an argument with his parents, ran out of the house, emptied the gun safe, took guns down to a neighbor's house, alarmed the neighbor, told the neighbor who tried ... His friend, Eric, who tried to get the gun away from him, I don't want to use it on you. In other words ... What in the record did these officers that fired the guns, what did they know? They knew all of that. They knew all of that? Yes, sir. I believe so. You believe so? No, I know so. We've cited the references in the record in our briefing where Lieutenant Cassidy states what I knew or he knew. Lieutenant, I'm sorry. He knew about the Eric incident. Yes. I might want to use it against you. Did he also know that then Randy had avoided another police officer? Yes. Officer Hunter's declaration states, I saw and heard Eric Reed telling the officers, this is what's happened. When Officer Hunter testified, I saw the encounter in the neighborhood where the officers ordered him to put the gun down before I got back in my vehicle and ran around to intercept him. I saw him get that order from the two other officers. Can I ask two questions of law? One, you started to cite a case called Salazar. Salazar v. Limon v. City of Houston. Right. That just came down. Was that cited or? It's cited in some of the earlier briefing. It is? And in that case. Right. I know the facts of the case, so you're relying on it. I just want to make sure they were aware of that case. My legal question is, can you cite to me any decision where qualified immunity was given in a shooting situation where no warnings were given by the police before they shot? Yes. Okay. Because that factors into the reasonableness, doesn't it? Yes. It does. In Young v. City of Killeen, I don't believe there was a warning. Ontiveros, there wasn't a warning. Because most of the cases we cited in our earlier opinion involve persons who disobey warnings, then they get shot. Yes. Salazar v. Limon, there was an altercation, but not a warning before there was a shot. Ontiveros. Is it problematic, last question, is it problematic for your proposed rule that they didn't warn him before they shot him? No. And let me address, if I may answer that question. But is that part of the expert's advice is don't warn them because that may shoot you? No. But isn't that true? Doesn't the same logic follow? But if you give them a warning, you're giving them a head start. It's a training that they warn them or not. The training is a warning if feasible. The training, did they follow that rule here? It wasn't feasible, so they did. I'm sorry? They did follow the training because a warning wasn't feasible. Did they give a warning? That's a disputed fact, and we accept that they didn't give a warning for this proceeding. And why it's not feasible to give a warning, and I'd like to point to an 11th Circuit case that I had not previously cited, Crenshaw v. Lister, 556 F. 3rd, 1283. You called this briefing and you didn't cite it? Why is it not feasible to give a warning here when the information that they had was that he had confronted other officers and he didn't shoot anybody? And he, and they, I mean. Officer Hunter is. Why is it now so dangerous that he didn't harm anybody at the other confrontation of officers, and you won't even give him a warning? Officer Hunter was 10 to 20 feet away with no cover, and nothing would be an obstacle to being shot. But he had his gun raised, pointed. Yes, and that's what I was trying to do. Whereas Mr. Cole had his back to him, had his gun to his head. You cite all these training, you tie, you die, action versus reaction. It seems to me, I'm no marksman, but if you get your back to somebody and you're You don't have as good a shot. You don't have the time necessary in comparison to the policeman who's already pointing his gun at you, ready to shoot. So I don't see how you can just shoot somebody unless they are in a more precarious, threatening position. But more than that, you argue that it wasn't feasible for him to even warn the guy. He was, yes, he was. He was dead when he walked out of the woods. He would, if he would not. He was dead when he walked out of the woods. You weren't going to warn him? You had your guns ready to draw and fire? And you did. No. Because he was turning with a gun in his hand. Because he had a gun in his hand. With his finger on the trigger and turning toward the officer. And pointed at his head. I'm sorry? And pointed at his head. At one point, yes. Pointed to his head when the bullet struck. At the point that he died. I don't think he died. He didn't shoot himself in the head. After he was, I suppose after he had already been shot several times by the police officers. Yes. All the shots were in 2.37 seconds. All right. Okay. We don't know whether he squeezed the trigger on his own. Or whether it was a reflex from the shots that he was being hit. I guess that's fair to say. That's not known. All right. You've saved some rebuttal time. Thank you, Mr. Jeffrey. Mr. Ayers. Good afternoon. My name is Jack Ayers. I represent the Cole family. May I address a couple of things you ask about, Judge Higginbotham? I intend no slur on my opponent. There's direct evidence from our expert, Captain Bevel, that a minimum of five to seven seconds elapsed from the time Hunter saw this young man until the shooting occurred. He not only said it was feasible to give a warning. He said any competent police officer would have given a warning. That's what you were thinking of. That's what you were alluding to. I thought of it. I thought of it. And, Judge Clement, you're exactly right. This business about action is factored in reaction, and you die, you die, is a bunch of nonsense. We're talking about a human life in the Fourth Amendment to the Constitution of the United States. This is not a non-judicial execution. Well, what we're here for is to apply the reversal of our court in Luna. So, what case subsequent to Luna has denied qualified immunity when police shoot a person who has a gun and moves in their direction? What case can you cite anywhere in the country that has denied qualified immunity to police who shoots someone that moves towards them with a gun? I cited several cases, and I can't recall specifically, Judge Higginbotham. You cited, do you know of any case after Luna? That's what I was trying to say. Okay. I filed a bunch of things under the local rules of cases that had been decided. If you don't remember the specific case, why am I wrong in putting almost an exact overlay on Luna in the following respect? The Fourth Amendment only prohibits shooting. Well, in the Luna, we found, the Supreme Court told us it was not clearly established the individual was disturbed. That's what we have here. The guy's suicidal. The individual there was avoiding police. These officers knew he was avoiding police. And the only other factor I extract from Luna is that persons in the area were at risk. I disagree respectfully. Okay. If you look carefully at the opinion in Luna, you will find the following. The young man was intoxicated. He called the dispatcher of the police department, told them he had a gun, and he would kill any officers that tried to stop him, and was proceeding directly at the officers at the time he was shot. His man's even closer. He's 10 feet away. I beg your pardon? This man is proceeding directly at these officers. No, he is not. That's incorrect. He was walking backwards towards them. He was backing out of a thicket. He didn't know they were present. Forget what he knew. Forget what he knew. He's a lot closer to the officers here than he was, than Luna was to Malenix. Yes, sir. I thought your question to me was what was distinguishing about Luna. In terms of your saying that it's distinguishable in Luna because he called and said he had a gun, these officers saw a man with his finger in a gun. So, again, in my mind of thinking, the Supreme Court assessed factors that were much less dangerous to Malenix and gave him qualified immunity than these officers 10 feet away. I didn't take that the Supreme Court of the United States said anything was dangerous to Malenix. Malenix was supposedly acting on behalf of an officer that was underneath the bridge. Correct. Malenix was in no danger. How are these officers in this situation in a less risky predicament than those where there was a spike strip seconds away from applying to Mr. Luna? Please, Judge Higginson, I'm trying to answer your question. I don't agree with the Supreme Court in Luna, but that's the law. So, I'm simply trying to answer your question. Right. This young man had made a threat to kill any police officer that tried to interrupt him and he was driving at a very high rate of speed toward an officer under the bridge. This young man, in this case, didn't even know the police were present and no one had given him a warning, whereas Luna had had a warning for however many, at 100 miles an hour. What Chase was, he knew fully the police were trying to arrest him and so forth. It's not in the same universe. And let me make this clear, Judge Clement, you made this point and it's an excellent point. May I show you what I'm talking about? If you don't have a gun. He's bagged it up. He's bagged it up this way. And all this business about timing, you know, that's something juries decide. How about this? If my grandparents are over here in Miami and this is the time, I'm shot right here. This is the scene that's going to break my head. How did that stickling get on the side of his head if he was pointing the gun at these officers? And remember this, these people swore under oath that he turned around and pointed the gun at them. Let me repeat that. These people, these officers, swore under oath that he turned around and pointed the gun at them. Well, what's your record site for Officer Carson having sworn under oath to that fact? What's your record site? Don't just say. I'm not saying it. It's in my brief. I can't recall. I don't know. OK, I wouldn't. You would tell your position is that the record is clear that Officer Carson swore that he saw the gun being pointed? No, no, not saying Officer Carson is the one that was the third party. Hunter was the one that did the shooting and Cassidy. Officer Carson is the only one before us on the 14th Amendment issue, correct? As to the pleading issue. That's right. I thought you were talking about the Fourth Amendment issue. Perhaps I'm confused. OK, what would help me is to stay as much with the law as possible. What about your answer to the case he cited just before he sat down? I've never heard of the case. I've never seen it. I'd like to be able to respond to it. It's a 2016 decision that granted qualifying immunity. And in a footnote, it reads, Salazar disputes the direction of the turn or indeed that he was turning at all at the time he was shot. This factual dispute does not preclude summary judgment because Salazar didn't dispute that he was reaching for his waistband. So if you accept those facts, qualified immunity if a person reaches for a gun but not qualified immunity when the man already has a gun and turns with it? How could we harmonize it? Chigginbotham made the point very well in the original opinion that there's a tremendous difference between somebody holding a gun to their head who does not even know the police are present and someone disobeying a policeman's order to drop a weapon or taking threatening action in the face of the police officer. The absurdity of their position is they're getting the benefit of a factual scenario that's really the jury's entitled to consider. Their story before the district judge originally was he turned around and pointed the gun directly at the officers justifying the shooting. It was only after we disproved that. What qualified immunity case doesn't give qualified immunity if you just stop with the fact that he agrees they turned, that the evidence proved they turned? So a person with a gun 10 feet away turns towards policemen. What case doesn't give police officers qualified immunity? You're asking me to prove a negative. I'm asking you to cite any case for me. I don't know of a case that has a negative finding of that sort. Well, the circumstance that the story changed, the police officers all said they huddled and then they said he pointed the gun at us and then they later indicted him for that. Now the story is, to go something else, that raises the question of the credibility of the underlying predicate facts from which we are to judge this. So I think that if we, in other words, if a question then becomes whether a trial of the fact resolving that issue could resolve it on a factual basis that would not enjoy immunity or not. So that, in other words, if the underlying facts themselves. The Supreme Court has held consistently since Anderson v. Liberty Lobby that it's not the function of Article III judges to make credibility determinations or matters of that sort. These are matters that are reserved to a jury. The only point I'm trying to make, Judge Higginson, and I know you're sincere in your question and I'm sincere in my answer. I'm just looking for some case law. We've got a Luna decision that's a very complex decision to apply. I'd love any qualified immunity case where the police shoot, where it's undisputed that the person with his finger on the trigger turns in their direction. That's a split-second predicament. With respect? Yeah. You're going to have to stay with me on that because it's very specific. But if you read the affidavit, you'll see what I'm talking about. There's no evidence he ever turned toward the officers. If that were true, I would agree you win. May I finish? Yeah, please do. The only evidence is with what the police officers say. That's right. The police officer also had an earlier version. That's right. Quite different. You made a good point, Judge. Will you let me finish this, if I might? The evidence is in this case that he was backing up out of the thicket, holding a gun to his head. What they said originally was he turns around and points the gun at him. That's what justified the shooting. We disproved that. After we disproved that, they came up with this new story. So they're really getting the benefit of two factual scenarios here, which they're not entitled to. That simply says there's a credibility question about whether these officers lied repeatedly under oath about what happened. I thought—am I interrupting you? Go ahead. It's not important what I say. It's important what you think. Well, if you have a further answer, that would be helpful to me. But I thought that the expert reports, and you didn't dispute them, showed that the trajectory required that he would have turned. No. The trajectory angle—now, I'm getting on the edge of what I can tell you of my own knowledge because my education as a police officer on this is pretty old. But the trajectory analysis that Captain Bevel described was in a slightly upward trajectory, meaning the gun was directed in this fashion. And there is direct evidence, Judge Higginbotham, that according to Captain Bevel, the firing was involuntary. And he had three reasons for why it was. It was after he was shot. They even brought a fake—another fake— I thought their bullets— I beg your pardon? I thought their bullets hit him on his front side. No. No, Judge. Okay. Yeah. It's very important. I hope I'm not— Well, you may want to stand behind the podium. Okay. I don't know if you can see me. I don't know if you can see me. The first round, according to Captain Bevel, struck him in his left elbow just above his elbow, went through his arm, then penetrated his back, went all the way across his back, and ended up above his liver on the right side. The second one, Bevel testified, that would have incapacitated him immediately. As he was collapsing in this position, a second shot grazed his shoulder like an ice cream scoop and took some tissue out of his shoulder in a superficial fashion. That's exactly what the evidence says. Almost exactly. I can't—I would never tell you something I didn't think was true, but that's as accurate as I can be. And my point in all this is, if you adopt the analogy that they're using here, any time a person has a weapon, any time they have the weapon in their hand for any reason, and this court has already held this is not the law several times, the mere fact that you have a weapon in your possession does not justify a police officer in shooting you. True, but each time we say that, it's if aggressive motion, then you are justified. That's right. If the individual takes some threatening action toward the officer, and you also said quite correctly in that calculus you have to remember that Garner's command is that the officer must give a warning if it's feasible to do so. There was no warning given. This young man did not even know the officers were present. Judge, how could he possibly be a threat to the officers? They knew that. They knew he didn't know they were present. Look at all the facts they know. And again, this is what Luna tells us to look at. You can be unhappy with Luna, but listen to me. They knew he'd made a threat before to Eric. They knew he'd evaded another police officer. That's incorrect. One of the officers knew that. You need to check your record sets on that. Okay. One officer knew he'd made a threat. Mm-hmm. They knew he'd evaded another police officer. They knew he comes out. Walked away from the officer. He didn't do anything to evade him. He just walked away. Walked away from the officer. Ten feet away from them, finger in gun. And then the critical fact for me is, was there a motion towards them? Once, if that fact exists undisputedly, to me, you've got a problem with the case law. I respectfully disagree with you. I couldn't disagree with you more. Okay. If you couldn't, do you have a case to show that I'm wrong? Judge, there's not a case that says that you're not entitled to qualified immunity. The burden is on us to show what the facts are. And what we're saying is this is a fact question that a jury needs to resolve. There are so many variations in all this evidence that it's impossible for me to give you a case that specifically says one thing or the other in a case like this. So maybe we don't even have jurisdiction. Well, that's a good question. I raised that point in the Supreme Court with no success. Thanks. We got it back. I apologize to you for that, Judge. And I will say, and this is not sounding sycophantic, it was one of the best opinions I ever read in my life. I was honored to have been counsel in the case, not because of anything I did, but because of the quality of this court's opinion. I digress. Luna v. Mullinax is in a different universe, Judge Higginson. It just is. Otherwise, you're basically authorizing nonjudicial executions by police officers. Judge Higginbotham's opinion, his dissenting opinion in Mason v. Lafayette Parish, makes that point very well, that you can't just shoot people because you feel like it. You can't just shoot them because they might be a threat. You can't, because the Texas Ranger says action is faster than reaction, and you tie, you die. The Fifth Circuit Court of Appeals is supposed to rely on that sort of balderdash to decide the Constitution in this case? Okay. I mean, those are strong statements, but Mullinax shot and killed somebody. We said no qualified immunity. The Supreme Court reverses us. Yes, and I think that they did so on the basis I've just outlined. The young man had been fleeing from the police, knew the police were after him, was trying to escape, which is a gram factor, right? He called the dispatcher, told her he had a gun, he was going to kill anybody that tried to interfere, and according to the Supreme Court, was moving directly towards the officers at the time he was shot. Which is an immediate threat. That's an immediate threat. As opposed to someone backing off. That's right. Somebody doesn't even know the officers are there. That's my point. How can you be a threat to somebody that you don't even know is present? Let me clarify one thing. Excuse me, I'm sorry. How far apart were the shooters and the boy here, the police officers and the boy here? It was somewhere in the middle. How far apart were they? Judge, I'm sorry, my memory's a little fuzzy on this. I want to say it's in the 10 to 15 feet range, something like that. There's a picture that's attached to the affidavit. It's in the record. Judge Higginson wanted a sight, and I can't give you this one either. But there's a picture that shows the relative positions of the people, the way the officers described it. Remember when I told you that they told the investigators he turned around and pointed the gun at him? That's the only specific one. I think Bevel said it was 10 to 15 feet, but I'm not sure about that. I'm sorry, I should be sure, but I just can't remember. The point that I'm trying to make is this. Luna v. Malnax represented a unique set of facts which the Supreme Court found controlling. None of the facts that they found controlling in that case are present in this case, not one of them. There is no threat by this individual, this young man, to take a life. There is no threatening action of any sort by this individual at all because he didn't know they were present. And I'm not trying to sound sophomoric, but I question whether or not there could be evidence that somebody is a threat to someone else when they don't even know they're present. How could that be, logically? How is that possible? And you're dealing with a patient or a person that you know is mentally ill, who's mentally disturbed, which is a grim factor against the use of deadly force. And most importantly, every one of the Manisak cases, including the ones that Judge Clement cited many times and Judge Higginbotham has as well, always involve situations where the officer has repeatedly told the individual to drop the weapon or be subject to the use of deadly force. By the way, one of the things that I tried to file with the clerk, and I'll get off on that right now, is there's a new national consensus of force policy out that was put out by the Federal Law Enforcement Center which tracks exactly the analysis that you made in the original case. Do we have a sense of how much time left when the boy was backing out of the woods and he's holding the gun to his head? Before he turned, that is, when he's backing out of the woods, the police officers then did not, they never said drop your weapon. That's correct. If he walks out and he's got four, five, six, seven seconds to go by and he's holding the gun, nobody says drop your weapon. And then he turns. They never say that. But then they wait, the gun's drawn, and then he turns. There are all these variations of what happened out there factually. And the question for the plaintiff is whether a reasonable jury could find a factual set that would deny immunity. Yes. Or not. And you can't get past that if there is not a factual pattern that they could find. Yes. So the jury could say that we take the police officers were not being truthful when they decided to draw the gun. They changed that. And so we don't believe in that. But what could they believe objectively? What they could believe, and I won't leave the podium again in accordance with the presiding judge's direction, but remember I told you I don't think he ever turned around at all. I think he was walking with the gun. He had his gun to his head, and he simply did this. He didn't turn toward them at all. Think about it a minute. What would you turn to face somebody if you didn't know they were there? Why would you turn to face them? That makes no sense. That's the kind of case I'll win to a jury. I know. You spent your lifetime in the courtroom. I happen to know that. I'm very successful at it. But in the rarefied atmosphere of here, I'm trying to get a handle on where we are with the Supreme Court. I mean, they are supreme because they're final. And in trying to apply these rules that are here, and if there is a factual pattern which a jury could reasonably believe, I find from the evidence that it would create a circumstance under which there would be no immunity, no qualified immunity. Then I think they really weren't threatened. The life wasn't really threatened. The best answer I can give you. Okay, but otherwise, you know. The best answer. Do you want me to finish or not? Go ahead. I didn't mean to interrupt. The best answer I can give you, Judge, is the one I just gave you. I don't believe this young man knew the officers were there. I don't believe he turned to face them. I believe it's all a lie. It was all a lie after the fact to cover up what they did. And a jury could find that. A jury could find that he never knew the officers were there, he wasn't a threat, and therefore their use of force was wholly unjustified. And that's on top of the fact that they violated Garner on the face of it by not giving him a warning. Counsel told you up here it wasn't feasible to give a warning. Five seconds. One, two, three, four, five. If you believe that they didn't have time to give him a warning, then rule for him. Thank you. Okay, thank you. All right, Mr. Jaffray, you have some rebuttal time. Thank you. The officers have not changed their story. The officers have accepted the facts that were disputed that were found against them and have said even with those facts found against them at the district court level summary judgment proceeding that the law doesn't deny them qualified immunity. I think that's important. I think it's also very important Judge Higginson, Mr. Ayers, stood here and demonstrated I don't think he turned and demonstrated the turn. And it's never been disputed before today that the young man was turning when the shots were fired. This Court's opinion recognized that at 758 of the Cole opinion. And, you know, the record references throughout our briefing, all of the positions that have been taken, the young man was turning throughout the time the shots were fired. Mr. Bevel, his expert, testified to that, and he was turning. Well, his arguments to me have adjusted the landscape somewhat. They're less legal in Luna. It's more now they had time to warn. That wasn't part of our decision before, correct? No, your decision was. And his argument also now is he didn't turn. That also wasn't part of our decision, correct? But there. . . I. . . Go ahead. To answer your first question, you did recognize in your first decision that there was no warning. I concede that. But did we apply that to the reasonableness determination? That was one of the factors that was considered, and that is a factor that could be or should be considered. Okay. But here the officers can see there's no warning. The case that I cited out of the 11th Circuit involves officers that are using a K-9, and they're armed, hunting for somebody in a wooded area that they suspect is armed, and they didn't want to give away their position, so they didn't. . . This is Crenshaw? Yes, sir, the 11th Circuit, yes. And in that case, the court said a warning wasn't required to give away their position. And so in recognition that the officer, Hunter, is in 10 to 20 feet away, 15 feet, Mr. Ayer says, but in an open position, there's nothing between him and the young man with the gun except air. And the young man starts turning. And I think the Salazar-Limon case cannot be reconciled with finding that this officer or both officers who fired are deprived of immunity. Are you saying that on the record that there's no evidence that at the initial, at some point in time, the police officer said that in fact he lowered the gun at that level at them? I'm sorry. Are you saying that there is no evidence that the police officer's first story was that he lowered the gun and pointed at them, that he turned to fire at them? The officers who saw the events, Hunter and Cassidy, both testified the gun was pointed at Hunter, and that's what made them shoot. At the gun was pointed where? Officer Hunter. No, the gun was pointed in what direction? Towards Officer Hunter, which would have been something akin to that. Is that still the story? No, we have to accept that. That has a little problem with it in terms of him shooting himself in the side of the head, doesn't it? No. Oh, it doesn't? The total shooting took place in 2.37 seconds. He can move his hand. I've went over this three times. I don't want to argue with you about facts. I don't know what the facts are. My question has to do with the question of it. I came away with the impression that the police officer's accounts had changed, and I didn't think there was any real dispute about that. Now, whether that's because they got together and decided maybe that's what really happened, I don't know. I don't know whether that story has changed. Does it mean they're lying? I don't know. Their testimony didn't change. The arguments we're making on appeal and made at the summary judgment stage are even accepting the facts that were proven against them, the fact disputed against them, that they're still entitled to qualified immunity. Is it irrelevant to the objective reasonableness standard whether they had stories subsequently that changed? I don't think so. I think you find when you're analyzing objective reasonableness, you take the facts, the disputed facts, view them in favor of the plaintiff, and then if those disputed facts defeat immunity, they defeat immunity. If those disputed facts don't— I asked him a factual question whether Officer Carson ever said that the police officer said he— did Officer Carson ever say he saw the gun pointed at them? No. In fact, Officer Carson states, according to the attachments to the plaintiff's complaint, I did not see what happened. My view was blocked by Lieutenant Cassidy. I heard the shots. So on the substantive due process issue, the relevant wrongful police conduct is just his statement that commands were given? No, because the pleading— The complaint, yes. Okay, the complaint alleged both. The complaint alleged that he manufactured a story. The attachments to the complaint say differently. But this case as to Carson can't be governed by the 14th Amendment based on the Manuel v. City of Joliet case that was decided in April, and we gave a supplemental brief on that. And because the Fourth Amendment claim has already been disposed of in favor of Officer Carson based on a combination of Devin Peck and the undisputed fact that this young man was guilty of the offense of unlawfully carrying a weapon, he pled guilty to it in a plea bargain, and actually it was disposed of against him. And so this panel correctly ruled that the Fourth Amendment claim against Officer Carson failed. Charged him with a felony. What was the indictment against him? I don't believe he was indicted, but that's not in the record. Indicting a charge. A charge fell against him, and it wasn't just for the possession of the weapon, was it? No, it was aggravated assault on a public servant. Aggravated assault. And the aggravated assault was based on the fact that he pointed the weapon at them. Yes. Okay. But as to Carson, again, the Fourth Amendment claim is all that could be left, and this Court's already correctly disposed of that in favor of Officer Carson. But Judge Higginson, your observation that if the evidence shows the young man was turning while holding the gun, that's going to create a problem for the plaintiff on qualified immunity analysis, particularly in light of Salazar v. Lamone v. City of Houston. The record is undisputed to this point that he was turning throughout the 2.37 seconds that shot. Throughout your argument today, you really have not maintained that this boy leveled a gun at them. You rather said that he was holding the gun in this position, whatever, and they will perceive that. But the DA, at the behest of the officers, filed charges against him which said he was guilty of aggravated assault. Correct me, but I see a great dention in those stories. The DA didn't account of this comes from what the police officers told him, and I thought that the charges were based on the aggravated assault was that he leveled a gun at them. I don't know how he would assault them if he didn't point the gun at them. So I assume that that's what the police officers told him that he did. Yes. And what's your account here is he didn't point the gun at them, but he was turning around, and it was turning, and by doing so, that in and of itself, under the expert testimony, that they had to shoot quickly or he could shoot first. But you never got the gun down, which is the basis of what your indictment were. So when you say there was never a conflict, that the story has never changed, I don't know how then you filed the charges against him that you did. Maybe I'm missing something. Let me explain. The officers have not changed their testimony, which was— I know you've said that 10 times. My question, though, is that the basis of the charges against him was aggravated assault, and that the story that you're now telling, I do not see how there was a basis for an aggravated assault by him. He may oppose the threat to him and perceive that he might do that, but that's not an aggravated assault, is it? Not the way I understand a criminal law. We're tolerating the police giving them an edge that there's a risk and a threat. Implicit in that is there's a risk that there was no threat. But we're giving the edge to the officer. Now, that's where the immunity doctrine is working. I'm not making an observation about that. Police officers need protection. I'm just suggesting to you that as I understood this case evolving, you went out and indicted the boy when he was lying there near death, and you did that for a reason, didn't you? You charged him with a—I don't know if it was indictment or what. You charged him with, of course, possessing a weapon. And that's the lawful charge because he was possessing a weapon. What's the basis for charging him with filing a charge against him? Why was that done? We don't know. My understanding is that Officer Hunter and Lieutenant Cassidy and the Garland detective investigator stated that the young man pointed his gun at Officer Hunter. That's right. That's what I'll need. Thank you. All right. Thank you. That concludes our docket for today. We'll be at recess.